**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony J. PETERS, Lawrence Peters,**
**and Jacek Odoner,**
**Defendants-Appellants.**

**Nos. 84–2108, 84–2146 and 84–2109.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1985.
Decided May 20, 1986.

Franklyn M. Gimbel, Gimbel, Gimbel & Reilly, William S. Mautner, Bruce C. O'Neill, Fox, Carpenter, O'Neill & Shannon, Milwaukee, Wis., for defendants-appellants.

Lawrence O. Anderson, Joseph P. Stadt-mueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, FLAUM, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

After a joint trial lasting approximately four weeks, defendants Anthony Peters, Lawrence Peters, and Jacek Odoner were each convicted of drug-related offenses. All three defendants appeal and assert numerous grounds of error. We affirm the convictions on all grounds and uphold all three sentences.

Anthony Peters was the "kingpin" of an extensive cocaine-dealing business in Milwaukee from 1979 until 1983. Lawrence Peters, Anthony's brother, acted as the second-in-command of the conspiracy and took care of whatever Anthony Peters did not attend to personally. Jacek Odoner travelled to Florida to buy cocaine, stored the cocaine in his father's house, and was one of Anthony Peters' numerous "delivery boys."

In April 1983, a grand jury entered a fourteen-count indictment against Anthony Peters, Lawrence Peters, Jacek Odoner, Edward Odoner, John Gingras, John Redford, Walter Daniels, Sal Dacquisto, and Thomas Pogodzinski. The majority of the counts named Anthony Peters, with the others figuring in either one or two counts.[1]

In May 1984, Anthony and Larry Peters, Odoner, Dacquisto and Pogodzinski went on trial. Walter Daniels, John Gingras, and John Redford negotiated separate plea agreements. Gingras and Redford testified for the government. Edward Odoner, Jacek Odoner's brother, disappeared, allegedly with money from the cocaine ring, and was never apprehended. Sal Dacquisto was convicted of conspiracy, was sentenced to eighteen months in prision, but does not

appeal. The jury acquitted Thomas Pogodzinski.

## I. ANTHONY PETERS

Defendant Anthony Peters was convicted of nine counts of possession and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of use of the telephone to distribute cocaine in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2; one count of interstate travel to facilitate a business enterprise involving the distribution of cocaine in violation of 18 U.S.C. §§ 2 and 1952(a)(3); and one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Peters received a total of twenty-two years in prison and a special parole term of three years. Peters forfeited guns, automobiles, and real and personal property to the government pursuant to 21 U.S.C. § 848 after the jury found that all the items were the profits of a continuing criminal enterprise.

Peters claims eleven instances of error. Peters asserts that the search warrants for his home and for his parents' home were impermissibly broad, that the district court should have conducted a pretrial probable cause hearing for his property, that the court erred in denying Peters standing to challenge the search of a 1972 Jaguar, and that the court erred by refusing to hold a hearing to enable Peters to explore the circumstances surrounding the excusal of a grand juror. Peters also challenges the court's instruction admitting coconspirator's hearsay testimony, the court's refusal to sever count fourteen from counts one through thirteen, the court's instruction about the relationship between counts one and fourteen, the sufficiency of the evidence of count fourteen, the admission of testimony of threats made by him, the admission of the business records of an interior decorator, and the admission of hotel and telephone records of David Word.

---

1. Count 13, charging Anthony Peters, Jacek Odoner, and Edward Odoner with interstate travel to facilitate the operation of a cocaine distribution business, was dismissed during the trial for lack of evidence.

## A. SEARCH WARRANTS

Anthony Peters contends that the search warrants issued for his home and for his parents' home failed to describe with particularity the items to be seized and were overly broad. On April 26, 1983, the district court issued two search warrants, one authorizing a search of 3370 North Gordon Place, Milwaukee, the other authorizing a search at 3043 North Hackett, Milwaukee. The North Gordon search warrant was accompanied by a three-page, eleven-paragraph list of property to be seized and an eighteen-page affidavit. The supporting affidavit had two exhibits, a summary of Peters' various purchases, improvements, and trips, and nine invoices of Peters' purchases. The Hackett search warrant authorized the seizure of "[g]ems, narcotics, and currency, the profits of a Continuing Criminal Enterprise, 21 U.S.C. 848."

■ First, Peters argues that the North Gordon warrant authorized the seizure of items only evidencing possession of assets.[2] Peters asserts that the warrant's language authorized the seizure only of indicia of ownership, such as titles and bills of sale, and not the actual property. This novel argument is flawed, however, as the language at issue appears on the first page of the affidavit, not the search warrant. The warrant does not incorporate the affidavit by reference. The search warrant incorporates only a list of property to be seized, describing items such as "[a] Corfu brass/bronze/glass cocktail table" and "[a] Wild Boar Farnese bed, pillow shams and fitted bed cover." Although not all eleven paragraphs are as detailed as these two

items in paragraph ten, the property list for the North Gordon warrant is sufficiently specific to meet the "particularity" test of *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

■ Peters' second argument attacks paragraph eleven of the North Gordon search warrant and also challenges the Hackett warrant's description of property to be seized as "[g]ems, narcotics, and currency, the profits of a Continuing Criminal Enterprise, 21 U.S.C. 848." Peters argues that this language gave the agents executing the warrants too much discretion.[3] This argument is unpersuasive. The Supreme Court addressed a similar argument in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The warrants in *Andresen* were allegedly rendered overbroad by the presence in each warrant of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown" at the end of a long list of documents. The Court rejected the overbreadth argument and held that the "clauses in the series are limited by what precedes that colon.... The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime of false pretenses." 427 U.S. at 481–82, 96 S.Ct. at 2749.

Both the Hackett warrant's language and the North Gordon warrant's paragraph eleven modify the items preceding them. The allegedly overbroad phrase in the

---

**2.** The relevant paragraph describes the property as:

[I]tems evidencing the possession, obtaining, secreting, transfer, and/or concealment of assets, money, jewelry, and other profits of an illicit, continuing narcotics business; records and receipts, money orders and cashiers checks, receipts, correspondence, ledgers, telephone books, and other documents evidencing customers for narcotics; specifically, cocaine; narcotics paraphernalia; cocaine; evidence of ownership and control of the premises as well as other premises more particularly set forth in Exhibit A to the Affidavit.

**3.** Peters apparently does not challenge the use of categories such as "United States currency, precious metals, jewelry and financial instruments" in the North Gordon warrant and "gems, narcotics and currency" in the Hackett warrant. The use of generic terms in both warrants is not offensive. As the Eighth Circuit reasoned in *United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir.1976), "[w]here the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance."

Hackett warrant merely indicates that the specific items "gems, narcotics and currency" are to be seized as the "profits of a continuing criminal enterprise." The defendant's argument might have had more force if the Hackett warrant had authorized the seizure of "gems, narcotics, currency, *and* the profits of a continuing criminal enterprise." The wording and punctuation of the Hackett warrant, however, indicate that the "profits" language merely describes the statutory authority for the seizure and does not represent a separate category of property to be seized.

Paragraph eleven of the North Gordon warrant[4] likewise must be read in the context of the ten paragraphs preceding it. Paragraph eleven follows a very detailed list of property to be seized. Like the language of the Hackett warrant, paragraph eleven of the North Gordon warrant merely indicates the crimes of which the specific items previously listed are evidence. Paragraph eleven therefore did not expand the executing officers' authority beyond permissible limits, but rather described the source of that authority. The warrants described the items to be seized with sufficient particularity and therefore were not overly broad.

## B. PRETRIAL HEARING ON SEIZURE OF PROPERTY

Anthony Peters' second claim is that the district court violated his due process rights by failing to hold a hearing on the government's seizure of his property. Pursuant to two search warrants, the government seized a substantial amount of Peters' personal property[5] on the day Peters was arrested. After convicting Peters of operating a continuing criminal enterprise, the jury found that the seized property as well as some pieces of real property were the profits of the illegal enterprise. The district court ordered the real and personal property forfeited to the government pursuant to 21 U.S.C. § 848. At that time the government seized Peters' real property.

■ Peters asserts that the district court should have held an evidentiary hearing prior to trial to determine whether the government had the right to retain the property until trial. Peters urges this court to require a hearing as the Ninth Circuit did in *United States v. Crozier,* 674 F.2d 1293 (9th Cir.1982), *vacated and remanded,* —— U.S. ——, 104 S.Ct. 3575, 82 L.Ed.2d 873 (1984), *vacated in part and aff'd in part on remand,* 777 F.2d 1376 (9th Cir.1985).[6] We need not decide whether to follow the Ninth Circuit on this issue because the seizures in this case were made pursuant to search warrants.

■ Peters contends that although the property was seized pursuant to a search warrant, the government still violated due process by retaining his property until trial. Peters claims that the government should have returned the property after it had been inventoried and photographed. Peters urges that due process requires an adversarial hearing whenever the government seizes property either for forfeiture

---

**4.** Paragraph eleven of the North Gordon warrant states:

> 11. Any and all other material evidence of violations of Title 21, U.S.C. Sections 841(a)(1), 843, 846, 848, and Title 18, U.S.C. Section 1952 (possession with intent to distribute and distribution of controlled substances, in particular, cocaine; use of a communication facility to facilitate such possession and distribution; conspiracy to distribute and to possess with intent to distribute controlled substances, in particular, cocaine; engaging in a continuing criminal enterprise; and interstate travel or transportation in aid of a racketeering enterprise).

**5.** Peters asserts in his brief that the government also seized real property. The record reflects, however, that the government filed a lis pendens over Peters' real estate but did not seize it. A notice of lis pendens warns potential purchasers that the title to the property is in litigation.

**6.** In *Crozier,* the Ninth Circuit held that before issuing a restraining order pursuant to 21 U.S.C. § 848(d) a court must hold a hearing to determine the likelihood that the government will prove that the defendant violated the continuing criminal enterprise statute and that the property subject to the restraining order is profits from the enterprise and therefore subject to forfeiture under 21 U.S.C. § 848(a)(2). 674 F.2d at 1298.

or for evidentiary purposes or to prevent the use or transfer of the assets.

Peters' due process rights were not violated by the government's retention of his property pending trial. Peters cites no authority to support his claim that due process requires the return of evidence once the prosecution has inventoried and photographed the property. Furthermore, Fed. R.Crim.P. 41(e) [7] provides an adequate procedural safeguard against illegal governmental seizure of property pursuant to a warrant. Peters availed himself of this safeguard by filing a motion to suppress challenging the search warrants.[8] Due process did not require a pretrial adversarial hearing in these circumstances.

7. Fed.R.Crim.P. 41(e) provides:

 (e) Motion for Return of Property. A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

8. The district court considered Peters' arguments and then denied the motion. Peters challenges that ruling in this appeal also. As we have considered and rejected that argument in the preceding section, see section I(A) *supra,* it is unnecessary to address that issue here.

9. While executing a warrant authorizing the search of the home of Anthony Peters' parents, *see* section I(A) *supra,* government agents seized a 1972 Jaguar parked in the garage of the home. A search of the car uncovered 5 pounds of cocaine in the trunk of the car. The car was registered to Walter Daniels, who filed a pretrial motion to suppress the cocaine. The magistrate ruled that the search was illegal as the Jaguar was not seized pursuant to a valid warrant and none of the exceptions to a warrantless search applied. The trial court affirmed the magistrate's ruling and granted the suppression motion. Prior to trial Daniels entered into a plea agreement with the government. At that time Anthony Peters filed a motion to suppress the cocaine. The trial judge found that Peters

## C. SEARCH OF 1972 JAGUAR

Anthony Peters next challenges the district court's determination that Peters did not have standing to object to the search of a 1972 Jaguar owned by coconspirator Walter Daniels.[9] Peters' ability to challenge the search of the Jaguar depends upon whether he can establish a reasonable expectation of privacy in the car.[10] Peters asserts a reasonable expectation of privacy based on his occasional use of the car, on his possession of keys to the car, on his arranging to store the car in his parents' driveway from December 1982 until the time of its seizure in April 1983, on his paying for repairs to the car, and on his "equitable" interest in the car.[11]

lacked standing to challenge the search and denied the suppression motion. During the trial the defense renewed the motion before the government introduced the cocaine, and the judge again denied the motion.

10. Peters describes the issue as determining whether he has "standing" to challenge the search of the Jaguar. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), however, the Supreme Court rejected the label "standing" for this inquiry. The *Rakas* Court stated that "the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure ... belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing." *Id.* at 140, 99 S.Ct. at 429.

11. Peters also argues that evidence at trial supports his claim to challenge the search of the Jaguar. Peters points to the testimony of an unnamed witness who testified that Lawrence Peters told him Anthony Peters kept cocaine in car trunks to avoid discovery in case of a search. The witness said that Larry Peters then showed the witness cocaine hidden in the trunk of a car registered to John Gingras, but actually owned by Anthony Peters. A second witness, John Gingras, testified that Anthony Peters registered two of his vehicles in Gingras' name for "tax reasons." Gingras also said that Anthony Peters put the 1972 Jaguar at issue here in Daniels' name only for tax reasons.

The testimony of these two witnesses loses its force, however, in light of Peters' failure to testify to these things himself. At the suppression hearing Peters repeatedly denied knowledge or ownership of the cocaine in the Jaguar's trunk even though he could have admitted own-

■ As the Supreme Court has stated, "this inquiry ... normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'—whether ... the individual has shown that 'he seeks to preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'—whether the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (*quoting Katz v. United States*, 389 U.S. 347, 353, 351, 361, 88 S.Ct. 507, 512, 511, 516, 19 L.Ed.2d 576 (1967) (citations omitted)). The defendant has the burden of proving a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 101, 100 S.Ct. 2556, 2559, 65 L.Ed.2d 633 (1980).

■ In applying this two-prong test several factors are relevant:

[1] whether the defendant has a possessory [or ownership] interest in the thing seized or the place searched, [2] whether he has the right to exclude others from that place, [3] whether he has exhibited a subjective expectation that it would remain free from governmental invasion, [4] whether he took normal precautions to maintain his privacy and [5] whether he was legitimately on the premises.

*United States v. Haydel*, 649 F.2d 1152, 1155 (5th Cir.1981), *cert. denied*, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982) (*citing United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Applying these factors, we find that Peters has failed to meet his burden of proof and has not established that he had a reasonable expectation of privacy in the Jaguar.[12]

Peters was not in possession of the car at the time of the search. Nor does he assert legal ownership of the car, although he claims "an equitable ownership" interest. Peters bought the car and immediately sold it to Walter Daniels for $7,000. The title and registration were put in Daniel's name. Peters sold the car to Daniels to pay for $3,000 worth of carpentry work that Daniels was doing at Peters' home at the time. Daniels was to pay off the $4,000 difference in carpentry work for Peters, but at the time of the search Daniels had not paid the car off. Consequently Peters asserts an "equitable" interest in the car.

Peters' testimony at the suppression hearing, however, does not indicate that he had the right to control the use of or to exclude others from using the Jaguar. Peters and the owner each had a set of keys to the car, but Peters testified that he used the car only with the owner's permission. Peters does not assert that he ever drove the car on a regular basis, and the record indicates that at least two or three other people used the Jaguar.

Moreover, Peters' testimony at the suppression hearing does not indicate that he held any subjective expectation of privacy for the vehicle. None of Peters' state-

ing the cocaine without fear of having the admission introduced as substantive evidence later at trial. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Furthermore, Peters testified at the suppression hearing that he sold the car to Daniels immediately upon receiving it himself, and that title and registration were in Daniels' name from the beginning. Peters never asserted that the Jaguar was really his, or that Daniels owned the Jaguar in name only for tax reasons. Peters had the opportunity to claim ownership of either the cocaine or the Jaguar, but he declined to do so.

12. Peters also argues that the government inconsistently challenged Peters' expectation of privacy in the car and then later asserted that Peters had a sufficient interest in the car to warrant forfeiture as the profit of an illegal enterprise. This position, however, is not inconsistent as each determination focuses upon different considerations. The first issue requires the judge to determine whether the defendant had a legally recognizable privacy interest at the time of the search. In contrast, the jury determines whether the property constitutes the proceeds of an illegal enterprise only after the defendant has been found guilty.

ments suggests that he believed he could leave anything in the car and have it remain untouched. In addition, the record does not indicate that Peters took any precautions to assure privacy in the car. Finally, Peters was not in or near the car when the search occurred.

As support for his argument, Peters cites three cases, *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Portillo,* 633 F.2d 1313 (9th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1764, 68 L.Ed.2d 241 (1981); *United States v. Burke,* 506 F.2d 1165 (9th Cir.1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975), in which the defendants were found to have a reasonable expectation of privacy in cars over which, he asserts, the defendants exercised "less possession and control" than he did over the Jaguar. These cases, however, differ substantially from the case before us. In both *Jones* and *Portillo,* the defendants were present when the searches occurred and both defendants had exclusive possession and control except with respect to the owner. *Jones,* 362 U.S. at 258–59, 265, 80 S.Ct. at 729–30, 733; *Portillo,* 633 F.2d at 1317. In contrast, Peters was not in possession of the car at the time of the search and could not exclude all others save the owner. Furthermore, *Jones* dealt with the search of an apartment, and "cars are not to be treated identically with houses or apartments for Fourth Amendment purposes." *Rakas v. Illinois,* 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978). "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974). *Accord United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). In the third case, *Burke,* the determining factor was the de-

fendant's repeated use of the van which was searched. 506 F.2d at 1171. Peters' testimony at the suppression hearing, however, indicates that he at most used the car occasionally.

In this case, the defendant did not own the car that was searched and did not control who drove the car. He was unsure how many people had access to the car. Peters did not use the car on a daily or even a regular basis and did not testify that he had a subjective expectation of privacy. In these circumstances we hold that Peters did not exercise sufficient dominion and control over the car to give him a reasonable expectation of privacy in the Jaguar.[13]

## D. GRAND JURY

Anthony Peters next challenges the district court's refusal to allow him to inquire into the circumstances surrounding the excusal of a grand juror. The defendant argues that he was entitled to an adversary hearing to review the grand jury proceeding and to ensure that proper procedures were used to protect the grand jury's integrity.

Before trial Peters filed an *in camera* motion requesting either disclosure of the grand jury minutes or an evidentiary hearing into the administration of the grand jury. Peters' counsel submitted an affidavit stating that as part of discovery he had received a portion of a government surveillance report on a person living approximately two blocks away from Peters' parents' home. Peters' counsel phoned the subject of the surveillance and learned that he was a grand juror sitting on the Peters investigation. Peters' counsel then approached an Assistant United States Attorney who refused to comment upon the surveillance or upon the procedure for excusing a grand juror. The affidavit also states that an unnamed source informed Peters' counsel that the grand juror's house was

---

**13.** As we hold that Peters did not have a reasonable expectation of privacy in the car, we need not reach the government's argument that the warrantless search was a valid inventory search

conducted after the vehicle was properly seized as subject to forfeiture under 21 U.S.C. § 881(a)(6).

"raided" by the government, and that he later learned that the grand juror was excused while the grand jury was still investigating Peters.

After reviewing Peters' motion, his attorney's affidavit, and the government's sealed response, the magistrate declined to hold an evidentiary hearing. The magistrate concluded that "the government's attorneys proceeded cautiously and properly in order to protect the integrity of the members of the grand jury and their proceedings." The trial court affirmed the magistrate's ruling. The judge indicated that the defendant's concerns had been addressed and the administration of the grand jury had been proper as the magistrate had authorized the grand juror's discharge at the juror's request and without objection from the U.S. Attorney. Peters asserts that an adversarial hearing was necessary to determine whether the grand juror's excusal had prior judicial approval or was simply an exercise of arbitrary prosecutorial discretion.

"We begin our analysis by noting that the grand jury remains a creature of statute, at least in the provisions for its governance.... In the present case, Rule 6 provides the applicable statutory standard." *United States v. Lang*, 644 F.2d 1232, 1235 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981). Fed.R.Crim.P. 6(g) provides: "At any time for cause shown the court may excuse a juror either temporarily or permanently, and in the latter event the court may impanel another person in place of the juror excused." Rule 6(g) does not require an adversarial hearing before the court may dismiss a grand juror. Nor does Rule 6(g) require a court to notify the subject of the investigation that a grand juror has been dismissed or to explain the reason for the dismissal.

An adversarial hearing would disrupt and delay grand jury proceedings, and therefore a petitioner requesting such a hearing bears a heavy burden. "Persons charging irregularities in the course of grand jury proceedings must present 'a concrete basis' supporting the inference of misconduct." *In re the Special April 1977 Grand Jury*, 587 F.2d 889, 892 (7th Cir. 1978). The defendant has failed to carry this heavy burden. Peters' affidavit suggests that, as the district court found, the government excused the grand juror to protect the grand jury's integrity.

Peters also contends that the subsequent *ex parte* judicial review was inadequate to determine the appropriateness of the procedure for the grand juror's removal. Peters complains of "the denial of defendant's right ... to even challenge the government's conduct in administering a grand jury which returned an indictment of him." This amounts to a "general broadside attack against grand jury secrecy and the indictment system," *United States v. Frumento*, 405 F.Supp. 23, 33 (E.D.Pa.1975), and not a "concrete basis" which would support disclosure of grand jury minutes or an adversarial hearing. Moreover, the defendant challenged the excusal of the grand juror by filing a pretrial motion for disclosure of the grand jury minutes.

■ Fed.R.Crim.P. 6(e) controls the disclosure of grand jury matters. Rule 6(e) provides that "[d]isclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made ... upon a showing that grounds may exist for a motion to dismiss an indictment because of matters occurring before the grand jury." Dismissal of an indictment is warranted if the defendant shows an abuse of the grand jury process which affects a substantial right of the defendant or impugns the grand jury's integrity. *United States v. Phillips*, 664 F.2d 971, 1044 (5th Cir.1981), *cert. denied sub nom. Myers v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The Supreme Court has interpreted Rule 6(e) to require the party requesting disclosure to show a "particularized need" for the grand jury materials. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443, 103 S.Ct. 3133, 3148, 77 L.Ed.2d 743 (1983). The Supreme Court has enunciated a balancing test for trial courts enforcing Rule 6(e):

"Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.... [D]isclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure.... In sum, ... the court's duty in a case of this kind is to weigh carefully the competing interests in light of the relevant circumstances and the standards announced by this Court. And if disclosure is ordered, the court may include protective limitations on the use of the disclosed material...."

*Id.* (*quoting Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222–23, 99 S.Ct. 1667, 1674–75, 60 L.Ed.2d 156 (1979)).

The disposition of a motion to inquire into the grand jury proceedings falls within the district court's discretion, and we will not disturb the court's ruling absent an abuse of that discretion. *In re the Special April 1977 Grand Jury,* 587 F.2d 889, 892 (7th Cir.1978). The district court balanced the competing interests referred to in *Sells* and found that Peters' need for the government's documents did not outweigh the need to maintain the secrecy of the grand jury proceedings. The district judge in denying Peters' pretrial and post-trial motions, having twice reviewed the government's response, determined that Peters had failed to show a particularized need for the information in the government's *ex parte* response or for the disclosure of the grand jury proceedings. Furthermore, the court found that such disclosure might dis-

rupt an ongoing government investigation of matters revealed in the government's response. The information in Peters' supporting affidavit does not suggest that disclosure of some unspecified matters would uncover grounds for dismissing the grand jury's indictment. There is nothing in the record to link the grand juror's dismissal to the grand jury's decision to indict Peters. Peters does not assert that the grand jury would not have indicted him had the grand juror not been excused.

 Due process did not require the district court to hold an adversarial hearing either before or after the grand juror's removal. The district court's subsequent review of the government's sealed response to Peters' motion for a hearing was sufficient to ensure that the government had not violated the integrity of the grand jury. Moreover, excusal of a grand juror who was the subject of government surveillance does not establish that any impropriety occurred before the grand jury itself.

## E. INSTRUCTION UPON THE ADMISSION OF COCONSPIRATOR HEARSAY TESTIMONY

Anthony Peters argues that the trial judge's instruction on the second day of trial in admitting hearsay referring to codefendant Thomas Pogodzinski under Fed.R. Evid. 801(d)(2)[14] invaded the province of the jury. Peters interprets the court's instruction as alerting jurors that if the court allowed them to consider the hearsay evidence, then the court had found that a conspiracy had been established by independent evidence. Peters does not challenge the trial court's *Santiago* determination. Rather, the issue here is whether the trial judge erred in his comments to the

---

**14.** Fed.R.Evid. 801(d)(2) states:
(d) Statements which are not hearsay. A statement is not hearsay if—
(2) Admission by party-opponent. The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

jury regarding the admission of this testimony.

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978), the trial judge must make "an express finding, preliminary to admitting coconspirator hearsay, that the conspiracy and the defendant's membership in the conspiracy was proved by a preponderance of the evidence." *United States v. Medina-Herrera*, 606 F.2d 770, 773 (7th Cir.1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). This preliminary determination is made under Fed.R.Evid. 104(a)[15] outside the hearing of the jury. *United States v. Allen*, 596 F.2d 227, 230 (7th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 149, 62 L.Ed.2d 97 (1979). Under *Santiago*, the judge decides the admissibility of the coconspirator hearsay, and the jury then determines the weight and credibility of this evidence "as it considers all the evidence in determining whether guilt has been established beyond a reasonable doubt." *Santiago*, 582 F.2d at 1133. The judge may admit the coconspirator hearsay conditioned upon the prosecution subsequently establishing by independent evidence the existence of a conspiracy. *United States v. Andrus*, 775 F.2d 825, 837 (7th Cir.1985). If the condition is never satisfied, a mistrial or at least an instruction for the jury to disregard the hearsay statements would be necessary. *Id.* At the close of all the evidence, if the court rules that the coconspirator hearsay is admissible, this evidence goes to the jury with all the other evidence.

In ruling upon the admissibility of coconspirator hearsay, the judge should not explain to the jury his ruling on this issue. *Allen*, 596 F.2d at 230; *Santiago*, 582 F.2d at 1136. As the Sixth Circuit has advised, the trial judge

> should refrain from advising the jury of his findings that the government has satisfactorily proved the conspiracy. The judge should not describe to the jury the government's burden of proof on the preliminary question. Such an instruction can serve only to alert the jury that the judge has determined that a conspiracy involving the defendant has been proven by a preponderance of the evidence. This may adversely affect the defendant's right to trial by jury. The judge's opinion is likely to influence strongly the opinion of individual jurors when they come to consider their verdict and judge the credibility of witnesses.

*United States v. Vinson*, 606 F.2d 149, 153 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980) (footnote omitted).

More appropriately, the judge should at most merely caution the jurors at the time the coconspirator hearsay is admitted that the evidence was not subject to crossexamination. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 104[05], at 104–57 (1985).

> The court should not charge the jury on the admissibility of the coconspirator's statement, but should, of course, instruct that the government is required to prove the ultimate guilt of the defendant beyond a reasonable doubt. An appropriate instruction on credibility should be given, and the jury should be cautioned with regard to the weight and credibility to be accorded a coconspirator's statement.

*United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir.1978). *Accord Vinson*, 606 F.2d at 153.

In this case, on the second day of trial, the judge was asked to rule on the relevance of the witness' belief about the contents of a bag that codefendant Thomas Pogodzinski had been holding at the time in question. An off-the-record sidebar conference was held, and then the judge gave the

---

**15.** Rule 104(a) provides:

> (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

instruction at issue.[16] The judge allowed the testimony to continue; and a little further on, after another sidebar conference, the judge gave a "curative" instruction telling the jury to disregard his previous comments.

These instructions amounted to an explanation of the judge's admissibility ruling on the coconspirator hearsay. The defendant does not cite, however, nor has this court's research uncovered, any case holding that an instruction of this type is reversible error. Although the better practice is to refrain from instructing the jury on the reason the coconspirator hearsay is admissible, or to caution the jury on the credibility of such hearsay, the trial judge here in any event later withdrew his comments. *See United States v. Allen,* 596 F.2d 227, 230 (7th Cir.1979). The judge's comments about the admissibility of the hearsay testimony did not deprive Peters or his codefendants of a fair trial.

Although the trial judge's comments to the jury were ill-advised, we do not find that his remarks actually prejudiced Peters or his codefendants. The court's comments were at best vague, unclear, and possibly confusing for the jury. These comments were not, as Peters would have us believe, a forceful *de facto* pronouncement to the jury that the government had convinced the judge that a conspiracy existed. Moreover, "the jury had abundant, non-hearsay evidence on which to base its verdict." *Vinson,* 606 F.2d at 152. As discussed in detail in sections I(H), II(E) and III(H) *infra,* the government's proof of the conspir-

acy rested upon substantial non-hearsay testimony from several witnesses.

Furthermore, any confusion caused by the comments was cured by the court's customary and complete final instructions to the jury about its role and about the law of conspiracy. In these final instructions the judge also told the jurors that they were "at total liberty to disregard all comments of the court in arriving at . . . findings as to the facts."

The jury's acquittal of codefendant Pogodzinski attests to the jury's understanding of the judge's instructions and the jury's lack of confusion or prejudice from the trial judge's earlier unfortunate remarks. Therefore reversal of these convictions is not required on these facts.

### F. SEVERANCE OF COUNT FOURTEEN

Anthony Peters next contends that the trial judge erred in refusing to sever count fourteen from counts one through thirteen. Peters asserts that the district court's ruling prevented him from testifying and that his testimony would have provided exculpatory evidence on count fourteen. Peters concedes that joinder of the counts was proper under Fed.R.Crim.P. 8, but argues that severance was mandated under Fed.R. Crim.P. 14.[17]

Peters, in a sealed affidavit to the district court, stated that in a separate trial on count fourteen he would have admitted the substance of counts one through thirteen in order to present his defense to count fourteen. Apparently Peters sold gems with

---

**16.** The judge gave the following instruction:

Ladies and gentleman of the jury, you will be told, I guess I am telling you now, that many places during this trial there will be a contention, I suspect, about declarations by various people, declarations that are made out of court by people who are established by independent evidence to be members of a conspiracy, is admissible against all members of the conspiracy.

Once their membership in the conspiracy is established, on the other hand, and so the way the Court has handled that is customarily to receive that, what otherwise would be hearsay, evidence subject to a motion for mistrial.

If the conspiracy is never effectively established, and there will be a number of instances of that kind of ruling, having to be made here. The question is what did this witness believe was in that bag.

I am going to overrule the objection based upon the same line of thought; in other words, you may be told this is going to have to be disregarded later.

**17.** Rule 14 provides in relevant part:

If it appears that a defendant . . . is prejudiced by a joinder of offenses . . ., the court may order an election or separate trials of counts . . . or provide whatever other relief justice requires.

inflated appraised values. Peters would have testified that he amassed a substantial amount of money from his gem business. Peters would have testified that he "passed himself off as a cocaine dealer" in order to gain the confidence of drug dealers whom he assumed would have large sums of money to spend on his gems and would be unlikely to check the gem values. This testimony, Peters felt, would explain his massive amount of wealth and would discredit the government's theory that Peters accumulated his wealth by operating a criminal enterprise.

The trial court denied him due process, Peters asserts, by presenting him with a "Hobson's Choice" of testifying and admitting guilt on counts one through thirteen, or not testifying and avoiding self-incrimination but also foregoing the opportunity to present exculpatory evidence on count fourteen.[18] Peters cites *Baker v. United States*, 401 F.2d 958 (D.C.Cir.1968), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970), to support this argument.[19]

■ The issue here is whether Anthony Peters has established that the district court's refusal to try count fourteen separately caused him to suffer substantial actual prejudice and to receive an unfair trial. *See United States v. Percival*, 756

F.2d 600, 610 (7th Cir.1985); *United States v. Harris*, 761 F.2d 394, 401 (7th Cir.1985). "[S]everance is not mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant." *Holmes v. Gray*, 526 F.2d 622, 626 (7th Cir.1975), *cert. denied sub nom. Holmes v. Israel*, 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 194 (1977). The defendant's showing of actual prejudice must be balanced against the policy encouraging joint trials—especially when a conspiracy is charged—for judicial economy and to avoid lengthy and repetitious trials involving the same evidence and the same witnesses. *United States v. Papia*, 560 F.2d 827, 836–37 (7th Cir.1977). Because the trial court is in the best position to balance these concerns, a court's decision on a severance motion will be reversed on appeal only upon a clear abuse of discretion. *United States v. Gironda*, 758 F.2d 1201, 1220 (7th Cir.1985).

■ Peters' contention mirrors the allegations made by one of the defendants in *United States v. Webster*, 734 F.2d 1048, 1052–53 (5th Cir.1984). Like Peters, Webster was charged with conspiracy, several substantive counts, and a continuing criminal enterprise count. Webster's trial strat-

---

**18.** Peters also complains that the district judge invaded the province of the jury by assessing the credibility of the defense theory in ruling on the severance motion. The record indicates that the judge did find the defense theory incredible and considered that in determining whether Peters had made a showing of actual prejudice warranting severance of the counts. The primary basis for the denial, however, was that "[t]he gem transactions apparently were going on simultaneously with some of the purported transactions that we're trying here, and that it is part and parcel of the same transaction or same chain of events." The judge also considered "judicial economy, the suitability of conducting separate trials, masses of evidence and masses of witnesses on what may or may not be ... spurious contentions of prejudice." A Rule 14 motion to sever counts is addressed to the district court's discretion, *United States v. Shue*, 766 F.2d 1122, 1135 (7th Cir.1985), and this record does not establish an abuse of that discretion.

**19.** The *Baker* court stated:

[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.

401 F.2d at 977 (footnotes omitted) (*quoted with approval in United States v. Jardan*, 552 F.2d 216, 220 (8th Cir.), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977)).

egy was to admit his involvement in numerous cocaine transactions while maintaining his innocence on the continuing criminal enterprise charge. Not surprisingly, the jury convicted Webster of the conspiracy and substantive charges, but nevertheless acquitted him of the continuing criminal enterprise count. On appeal, Webster argued that the court's refusal to sever forced him to admit guilt on the substantive counts in order to defend against the continuing criminal enterprise charge. The Fifth Circuit did not find this argument compelling, noting that "Webster certainly could have argued that he did not engage in any of the acts charged in the conspiracy or substantive counts and, at the same time, argue that he was not the head of the continuing criminal enterprise." *Id.* at 1053.

The *Webster* court's logic applies equally well to the facts in this case. Peters acknowledges that his argument "closely resembles" that made by Webster, but challenges the *Webster* court's finding that the defendant was not prejudiced because he voluntarily adopted a trial strategy of confessing guilt on the substantive counts. Peters argues that he did not make a truly voluntary choice because he would have had to either incriminate himself on the substantive counts in order to testify on the criminal enterprise count or forego presenting exculpatory evidence in order to avoid self-incrimination. These, however, were not his only two options. As in *Webster*, Peters was not barred from denying his guilt on both the conspiracy and the substantive counts and also presenting evidence that his income came from selling gems, not from heading a criminal enterprise. It was not essential to his defense that Peters explain the "occupations" that his gem business customers pursued. Furthermore, the court gave Anthony Peters' tendered instruction about his theory of defense.[20]

Peters has failed to show actual prejudice from the denial of his severance motion and has therefore failed to show that the district court abused its discretion by denying the severance motion.

## G. JURY INSTRUCTION ON COUNTS ONE AND FOURTEEN

 Peters challenges the instruction[21] given on the relationship between count one, the conspiracy charge, and count fourteen, the continuing criminal enterprise charge. Peters does not challenge the substance of the instruction, but he objects to the wording. Peters contends that the instruction gave "preferential treatment" to count fourteen and therefore prevented the jury from independently evaluating the two counts.[22] Peters' tendered instruction sim-

20. The instruction given stated:
It is the Defendant Anthony J. Peters' theory of the defense in this case that the wealth which was acquired by the Defendant during the period January, 1979 through April, 1983 was derived from the sale and trade of gemstones which were appraised at inflated values. It is further Defendant's theory that these gemstones were sold and/or traded to individuals engaged in illegal activities. If you find the evidence in this case raises a reasonable doubt in your mind as to the source of the Defendant's substantial income, then you should acquit the Defendant of Count 14 of the indictment.

21. The judge instructed the jury:
If, but only if, you unanimously find defendant Anthony J. Peters not guilty of the crime of conducting a continuing criminal enterprise as charged in Count 14 of the indictment or if you cannot unanimously agree that the Defendant Anthony J. Peters is guilty of that crime, then you must proceed to determine whether Defendant Anthony J. Peters is guilty or not guilty of the lesser offense of conspiracy as charged in Count 1 of the indictment.

22. Peters also asserts that the court erred by giving a lesser included offense instruction at all. Peters acknowledges that participation in a narcotics conspiracy under § 846 is a lesser included offense of operating a criminal enterprise under § 848. *United States v. Jefferson*, 714 F.2d 689, 705 (7th Cir.1983). Peters argues, however, that a lesser included offense instruction is inappropriate where, as here, the lesser offense is charged in the indictment instead of being raised by the evidence.

No case has addressed this particular issue, but the Supreme Court has stated in dicta in a case involving a conspiracy and a continuing criminal enterprise charge: "If the two charges had been tried in one proceeding, it appears that petitioner would have been entitled to a

ply informed the jury that they could find Peters guilty of either count one or count fourteen.

When reviewing jury instructions, "we view the instructions as a whole and 'as long as the instructions treat the issues fairly and accurately, they will not be interfered with on appeal.'" *United States v. Thibodeaux,* 758 F.2d 199, 202 (7th Cir. 1985) (*quoting United States v. Croft,* 750 F.2d 1354, 1366 (7th Cir.1984)). In addition, "'[i]f a charge is substantially accurate, it is not error for the trial judge to refuse to use the language submitted by counsel.'" *United States v. Zarattini,* 552 F.2d 753, 759 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977) (*quoting United States v. Sacco,* 436 F.2d 780, 783 (2d Cir.), *cert. denied,* 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971)). Considering the instruction on this issue as a whole, we do not find the instruction "prejudicially erroneous." *United States v. Shaffner,* 524 F.2d 1021, 1023 n. 2 (7th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The instruction follows the language of the Seventh Circuit's lesser-included-offense instruction,[23] and is "substantially accurate."

The court began by issuing general instructions covering issues such as burden of proof. At the very beginning of these preliminary comments, the judge told the jury "not to single out one instruction alone as stating the law, but ... consider the instructions as a whole, as a totality."

Before reading the indictment, the judge admonished the jury to consider each count separately as to each defendant, stating, "you must consider each count and the evidence relating to it separate and apart from every other count." The judge also stated that the jury should not interpret either the instructions or the verdict form as an indication of the verdict he thought should be rendered. The court then read the full indictment, listed the elements of each count separately, and gave the legal definition of the significant aspects of each element of each count.

It is at best speculative that the jury would have inferred from the instruction at issue that the district judge for some reason preferred them to find Peters guilty of the continuing criminal enterprise charge instead of the conspiracy charge. The wording of the instruction would not raise that inference, even if the jury had focused upon it to the exclusion of the other instructions.

We do not find that the language of the instruction as worded as inaccurate or misleading. Moreover, we are unwilling to speculate that the jury would ignore the judge's specific instruction to consider each count separately. Considering the instructions as a whole, we do not find support for Peters' speculation that this instruction improperly directed the jury's deliberations or prevented the jury from evaluating the evidence for each count independently.

lesser-included-offense instruction." *Jeffers v. United States,* 432 U.S. 137, 153, 97 S.Ct. 2207, 2217–18, 53 L.Ed.2d 168 (1977). This is a logical position as a lesser included offense instruction is an added protection for the defendant. *See Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 344 (1973) ("defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater"); *Larson v. United States,* 296 F.2d 80, 81 (10th Cir.1961) ("where ... there is proof to support a lessor [sic] offense necessarily included in the offense charged, and the defendant timely requests that such lesser offense be submitted to the jury, the failure to do so withdraws from the jury a measure of defense to which the defendant is entitled and constitutes reversible error"). We

find no error in the giving of a lesser included instruction in these circumstances.

**23.** The Seventh Circuit's lesser-included-offense instruction reads:

The crime of _____ with which the defendant is charged in the indictment includes the lesser offense of _____.

If you find the defendant not guilty of the crime of _____ charged in the indictment [or if you cannot unanimously agree that the defendant is guilty of that crime], then you must proceed to determine whether the defendant is guilty or not guilty of the lesser offense of _____.

1 Federal Criminal Jury Instructions of the Seventh Circuit, Number 2.03 (1980).

## H. SUFFICIENCY OF THE EVIDENCE ON COUNT FOURTEEN

■ Anthony Peters argues that the government introduced insufficient evidence that he supervised a continuing criminal enterprise.[24] Peters concedes that the government introduced "massive evidence of conspiracy," but asserts that the prosecution failed to show that he directed or controlled five or more persons.

■ Initially we note that Peters has a heavy burden on this issue. A court reviewing the sufficiency of the evidence must uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985). An appellate court will not weigh the evidence or assess the credibility of the witnesses. *United States v. Wilson*, 715 F.2d 1164, 1173 (7th Cir.), *cert. denied sub nom. Williams v. United States*, 464 U.S. 986, 104 S.Ct. 434, 79 L.Ed.2d 187 (1983).

Peters challenges only the proof that he organized, supervised, or managed the activities of five or more persons. Peters claims that the witnesses who testified that they bought cocaine from Peters were not directed by Peters "as to price, conditions, time, identity, or in any other way" when they subsequently sold the cocaine. Peters concedes, however, that Lawrence Peters, Michael Schroeder and Jacek Odoner "might be said to have taken direction from Anthony Peters." "What is left," Peters maintains, "are occasional times when a loosely-knit group of friends would drop off cocaine as a favor [to Anthony Peters]."

To support its contention that Peters organized and supervised the activities of five or more persons, instead of merely participating in a conspiracy to distribute cocaine, the government called numerous witnesses to testify about Anthony Peters' cocaine activities. After reviewing the testimony of these witnesses in the light most favorable to the prosecution, we conclude that there was ample evidence that Peters "organized, managed or supervised" at least five people in a narcotics distribution business.

Three witnesses testified that for several years Larry Peters, Jay Mussbrugger, and Jacek Odoner delivered to them cocaine ordered from Anthony Peters. Two of these witnesses also stated that Walter Daniels and Anthony's other brothers, Steve and Matthew Peters, delivered Peters' cocaine to them at various times. In addition, four other witnesses stated that they themselves delivered cocaine and collected money for Anthony Peters. Finally, one witness, John Redford, testified that in 1981 Anthony Peters sent him to take over Peters' "Houston Connection" from another conspirator. While in Houston, Redford sold cocaine, mailed to him from Milwaukee by Larry Peters, and supervised John Schroeder and Debbie Helmuth who also distributed cocaine for Anthony Peters in Houston.

The testimony from these witnesses provided ample evidence from which "*any* rational trier of fact could have found the essential elements ... beyond a reasonable doubt." The evidence easily supports the conclusion that Anthony Peters organized, managed, and supervised the delivery of cocaine to his customers from a number of people. In addition John Redford testified

---

**24.** In order to convict Peters of operating a continuing criminal enterprise in violation of 21 U.S.C. §§ 841 and 843, the government had to show: (1) that Anthony Peters committed and supervised at least three violations of 21 U.S.C. § 841(a)(1) or § 843(b); (2) that Peters committed these violations as part of a continuing series of violations of the federal narcotics laws; (3) that Peters committed these violations in concert with five or more persons; (4) that Peters organized, supervised or managed the activities of these five or more persons; and (5) that Peters received a substantial income from this continuing series of narcotics laws violations.

that Anthony Peters sent him to Houston to distribute cocaine and to supervise two other conspirators in Houston.

From the evidence presented, a rational jury could have found that Anthony Peters supervised as many as twelve people over the years in operating his cocaine business, and therefore Peters' sufficiency claim fails.

## I. CHALLENGES TO THE EVIDENCE

Anthony Peters' final challenge is to the admission of three pieces of evidence: (1) threats that he made to Michael Dale and to Mary McCoy; (2) business records of an interior designer who worked on Peters' Chicago condominium; and (3) hotel and telephone records of David Word of Aspen, Colorado, allegedly Peters' source of cocaine.

In weighing the probative value of relevant evidence against the danger of unfair prejudice a trial judge has broad discretion as the judge is "much closer to the pulse of a trial." *United States v. Juarez*, 561 F.2d 65, 71 (7th Cir.1977). Accordingly, we will reverse a district court's evidentiary rulings only upon a clear abuse of discretion. *See United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985); *United States v. Falco*, 727 F.2d 659, 665 (7th Cir.1984).

### 1. THREAT EVIDENCE

The district court in two instances allowed the government, over the defendant's objection, to introduce testimony of threats made by Anthony Peters. First, Michael Dale, Peters' roommate at one time, testified that he had a phone conversation with Peters after a federal agent had visited Dale and questioned him about his relationship with Anthony Peters. Dale testified that Peters asked what Dale had told the agents, and he told Dale that "a lot of people would go down" if Dale told the agents anything. Peters also stated that "the only good snitch is a dead snitch." After listening to both sides' arguments, the district court applied the Fed.R.Evid. 403 balancing test and admitted the evidence. The district judge reasoned that the conversation with Dale tended to estab-

lish Peters' supervisory role and that the threat was "a part and parcel of the conspiracy."

Later in the trial, the court admitted over objection a tape recording of a telephone conversation between Mary McCoy, a paid informant for the government, and Anthony Peters. During the conversation, Peters accused McCoy of trying to "set us up" for the government and told her "you're going to be sorry, you don't know the half of it—you're not ******* around with a little punk ... I'm not making any threats on the phone, Mary, if I do something, you won't even know about it, Mary." The district court determined that the conversation was probative of Peters' supervisory role for the criminal enterprise count. The district court found that the relevancy of this evidence on this issue outweighed any possible prejudice, and therefore admitted the recording.

Peters argues that the "threat evidence" had slight or no probative value on the issue of the defendant's supervisory position, but had great prejudicial effect. The trial judge, however, found that both conversations were relevant to this issue and also to the existence of a conspiracy. After reviewing the conversations at issue, we cannot say that the trial judge abused his discretion in reaching that conclusion.

As the Second Circuit has noted:

[T]he potential prejudice from death threats may be great.... Thus, the government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test.... We stress, however, that death threats, just as other potentially prejudicial evidence, are to be judged by "the normal process of Fed.R.Evid. 403 balancing." *United States v. DeLillo*, 620 F.2d [939] at 944 [(2nd Cir. 1980)]. The trial court's "exercise of broad discretion will not lightly be disturbed[,]" *United States v. Williams*, 596 F.2d 44, 50 (2d Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979), because it is in a better position to

evaluate both the probativeness and the prejudicial effect of evidence.

*United States v. Qamar,* 671 F.2d 732, 736 (2d Cir.1982) (citations omitted).

Rule 401 defines probative or relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Probative value · is a "relative measurement." *United States v. Falco,* 727 F.2d 659, 665 (7th Cir.1984). Rule 403 requires the trial court to weigh the relevance of the evidence against its potential for prejudice. The district court found that this evidence was relevant to several important issues in the case and also assessed ˙the possible prejudicial effect of the evidence. Although the "threat evidence" may not have been the strongest evidence of Peters' supervision or of the existence of a conspiracy, the district court did not abuse its discretion in admitting this evidence.

### 2. BUSINESS RECORDS

Anthony Peters also challenges the admission of certain invoices and a summary sheet of the invoices of an interior designer, Jerry Deal, who worked for Anthony Peters in Peters' Chicago condominium. Peters argues that the government did not present sufficient evidence to authenticate the invoices. Peters also contends that the summary sheet does not fall within the business records exception because the sheet was made for tax reasons and not in the regular course of business.

The government introduced the invoices and the summary sheet through the testimony of Donna Plotzker, an employee of Jerry Deal. The invoices document purchases from September 1982 through April 1983. Plotzker testified that she worked for Deal from January through August

1981 and then returned to his employment in March 1983. Peters argues that Plotzker's testimony did not establish the reliability and accuracy of the invoices because Plotzker did not work for Deal when the invoices were prepared and therefore had no personal knowledge about who prepared the invoices, whether the information on the invoices was accurate, and whether Peters ever paid the bills or received the merchandise.

 Plotzker's testimony satisfied the trial judge that Deal's recordkeeping for his business was sufficiently regular to satisfy the evidentiary requirements of reliability and authenticity for the invoices under Fed.R.Evid. 803(6).[25] The admissibility of business records is entrusted to the broad discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion. *Rosenberg v. Collins,* 624 F.2d 659, 665 (5th Cir.1980). "Business records are reliable to the extent they are compiled consistently and conscientiously." *United States v. Ramsey,* 785 F.2d 184, 192 (7th Cir.1986).

> It is clear that, in admitting documents under the business records exception to the hearsay rule, "the testimony of the custodian or otherwise qualified witness who can explain the record-keeping of his organization is ordinarily essential." 4 Weinstein, Evidence ¶ 803(6)[02] (1981). *See also Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 307 (5th Cir.1978). Such testimony establishes the regular practices and procedures surrounding the creation of the records, the very elements that are necessary for a finding of trustworthiness.

*United States v. Wables,* 731 F.2d 440, 449 (7th Cir.1984). We find Donna Plotzker to be such a "qualified witness," and the dis-

---

**25.** Rule 803(6) allows the admission of:

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business ac-

tivity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

trict court did not abuse its discretion in admitting the invoices and the summary sheet.

Deal, who is in a coma with no expectation of recovery, operated his own interior design business. Other than Deal himself, Plotzker was the only bookkeeper Deal used in his business. Her work for Deal included preparing and processing invoices such as those admitted at trial. Plotzker readily identified the invoices introduced into evidence as those of Deal's interior design business by the form of the invoices and by the presence of Deal's printed logo on each invoice. She testified that Deal normally had invoices prepared at or near the time of the purchase. Plotzker testified that the invoices at issue were the type of document that Deal normally made in the ordinary course of his business.

She based this knowledge on her experience in preparing the same type of invoices for Deal when she worked for him in 1981, although she did not prepare these specific invoices. Plotzker furthermore stated that she had visited Peters' apartment with Deal and could identify certain pieces of merchandise listed on the invoices that she had actually seen in Peters' apartment. We find no abuse of discretion in the admission of these invoices.

■■■ Peters also objects to the admission of the summary sheet because it was prepared for Deal's tax return and thus, Peters argues, it was not made in the ordinary course of Deal's interior design business. Peters argues that the sheet thus does not qualify as a business record. We need not address this contention, however, because the trial judge specifically admitted the summary sheet under Fed.R.Evid. 803(6),[26] not Fed.R.Evid. 803(6) which deals with business records.

Plotzker testified that she had prepared a handwritten summary sheet of the invoices because Deal had requested the sheet to prepare his 1983 tax return. The sheet summarized the invoices Plotzker identified as describing merchandise purchased by Anthony Peters during 1982 and 1983. The sheet relates to all of the invoices that the court had previously admitted under Fed.R.Evid. 803(b)(6), and each invoice identified Anthony Peters as the purchaser. Plotzker's summary was handwritten, but the summary introduced into evidence was typed. Plotzker did not type the sheet and could not testify who did. Plotzker did not have the handwritten copy for comparison, but she stated that "to the best of my knowledge [the typed copy is] an exact copy of the handwritten copy I prepared."

The court found the necessary "circumstantial guarantees of trustworthiness" in Plotzker's testimony that the typed sheet was, to the best of her knowledge, an exact copy of the summary she had prepared and admitted the typed summary sheet under Fed.R.Evid. 803(24). After reviewing Plotzker's testimony that she had prepared a handwritten summary of the invoices of Peters' purchases, that she could identify certain items on the invoices that she herself had seen in Peters' condominium, and that the typed summary sheet relates to these same invoices, we are satisfied that the trial judge did not abuse his discretion in admitting the summary sheet under Rule 803(24).

### 3. EVIDENCE RELATING TO DAVID WORD

Peters' final evidentiary objection is to the admission of hotel and telephone records of David Word, Peters' source of cocaine. Peters first asserts that the evidence suggesting that David Word was Peters' cocaine source was too "tenuous" to support a finding of relevancy under

---

**26.** Rule 803(24) allows the admission of:
(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) that statement is more probative on the point for which it is offered than any other evidence which the opponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed.R.Evid. 401. Peters also argues that the evidence was "potentially misleading" and should have been excluded under Fed. R.Evid. 403.

■ The government contends that testimonial evidence established a sufficient connection between Peters and Word to make the documents admissible. Mark Gernetzke testified that he went to Aspen, Colorado, with Anthony Peters in 1979. Peters told Gernetzke to sit apart during the plane ride to Aspen and also on the return trip to Milwaukee. At Peters' apartment upon returning from Aspen, Gernetzke testified, Peters had a clear plastic bag containing a white substance. Michael Dale testified that Anthony Peters told him that a man named "Dave" from Aspen, Colorado "knew where to get the cocaine." Dale later met a "Dave" at Peters' apartment, and Peters silenced Dale when he asked Peters if this was the same "Dave." Dale identified a driver's license photograph of David Word as the man he had met at Peters' apartment. Michael Schroeder testified that Larry Peters told him that initially the cocaine came from Aspen, Colorado and later from Miami.

The district court found that Dale's testimony that Peters indicated his source was "Dave" in Aspen and his in-court identification of David Word's photograph as the man he had met at Peters' apartment established a connection between Peters and Word. The judge also found that an inference could be drawn from Peters silencing Dale after he asked Peters if David Word was the "Dave" from Colorado. The trial judge acknowledged that "you can argue all sorts of weaknesses in the inference," but that such weaknesses would go to weight, not to admissibility. Based on these considerations, the trial court admitted the evidence.

Fed.R.Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. Does the item of evidence tend to prove the matter sought to be proved?" Advisory Committee Notes to Fed.R.Evid. 401. In this case, the testimony concerning David Word and the telephone and hotel records establishing a relationship between Word and Anthony Peters tend to make it more probable than not that Word was Peters' source of cocaine. This evidence was therefore relevant and probative of Peters' involvement in a cocaine distribution conspiracy and of Peters' operation of a continuing criminal enterprise.

■ Determining that the testimonial and documentary evidence about Word was relevant does not end the inquiry, however, because Peters argues that the court should have excluded the evidence under Fed.R.Evid. 403.[27] Peters asserts that the prejudical impact of suggesting that Word was Peters' source of cocaine was much greater than the "virtually nonexistent" probative value of the evidence. " 'Unfair prejudice' within this context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee Notes to Fed.R.Evid. 403. Evidence is "unfairly prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.' " *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir.1980) (footnote omitted) (*quoting* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03], at 403–15 to 403–17 (1978)). The trial judge has broad discretion in assessing the possible prejudice of evidence, and

---

**27.** Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

a reviewing court will not lightly overturn the trial court's assessment. *See United States v. Falco,* 727 F.2d 659, 665 (7th Cir.1984) (trial court's balancing must be "accorded great deference"); *Ebanks v. Great Lakes Dredge & Dock Co.,* 688 F.2d 716, 723 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) (Rule 403 should be used sparingly).

As discussed in the previous paragraph, this evidence was probative on the issue of Peters' distribution of cocaine as well as his involvement in a cocaine conspiracy or his supervision of a criminal enterprise. Furthermore, this evidence regarding Word as a possible source of Peters' cocaine is not the type of evidence that would inflame the jury and cause the jury to decide the case on an emotional basis rather than on the legal issues involved. Admitting evidence about David Word, therefore, was not an abuse of the trial court's discretion.

## II. LARRY PETERS

Larry Peters, Anthony Peters' brother, was convicted of participating in a conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. Peters was sentenced to twelve years in prison. Larry Peters claims the district court erred by refusing to hold a pretrial hearing on the amount and effect of the case's publicity; by postponing decision upon and then subsequently denying the defendant's motion for change of venue; by failing to sequester the jury at the start of the trial; by admitting the testimony of prosecution witnesses who had agreements with the government; by denying the defendant's severance motion; by sentencing Peters to twelve years; and by refusing to apply the Young Adult Offender Statute. We affirm each of the district court's rulings.

### A. PRETRIAL HEARING ON PUBLICITY

 Larry Peters claims that the district court erred by refusing to hold a pretrial hearing on the nature, amount, and effect of the publicity generated by the case. Peters sought a hearing to present examples of newspaper articles and of the radio and television coverage. Peters sought a hearing also to ensure a complete record of the publicity for the appellate record.

We find no support for Peters' contention that the district court's refusal to hold an evidentiary hearing violated his Fifth Amendment due process rights. An evidentiary hearing was not necessary merely to ensure a complete record for an appellate review. The record contains newspaper articles attached to codefendant Sal Dacquisto's motion for a change of venue. The defendants could have attached more articles or submitted further affidavits detailing press coverage in support of the venue motion in order to flesh out the record on appeal. In addition, the defendant could have brought articles and other publicity to the trial court's attention during the trial to make a record. Due process does not require a trial court to automatically hold a hearing. It is a matter of the trial court's discretion depending on the circumstances.

Neither was the court obligated to hold a hearing simply to allow the defendant to bring newspaper articles and radio and television reports to the trial court's attention. The Fifth Amendment requires an impartial jury and a fair trial. The issue the trial court must consider when faced with pretrial publicity is whether an impartial jury can be seated. Accordingly, it was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors. After all, "[i]f the [voir dire] ... examination satisfied the trial judge that the effects of the pretrial publicity were not prejudicial, there would be no necessity for his holding an evidentiary hearing." *United States v. Gullion,* 575 F.2d 26, 28 (1st Cir.1978). We find no due process violation in the district court's refusal to hold an evidentiary hearing on the effects of pretrial publicity in this case.

## B. POSTPONING AND DENYING DEFENDANT'S MOTION FOR CHANGE OF VENUE

Larry Peters challenges both the trial judge's initial decision to reserve the defendant's venue motion until after the voir dire and the judge's subsequent denial of the motion.

 Peters asserts that the district court abused its discretion by reserving decision upon the venue motion until after the voir dire in April 1984. A court in its discretion may defer a determination of a pretrial venue motion until after the voir dire of the prospective jurors when the effects of pretrial publicity can be fully assessed. *See United States v. Mandel,* 415 F.Supp. 1033, 1052–53, 1067 (D.Md. 1976); *United States v. Balistrieri,* 346 F.Supp. 336, 339–40 (E.D.Wis.1972). "The ultimate question is whether it is possible to select a fair and impartial jury, and in most situations the *voir dire* examination adequately supplies the facts upon which to base that determination." *United States v. Daddano,* 432 F.2d 1119, 1126 (7th Cir. 1970), *cert. denied,* 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971) (footnote omitted). This was such a situation, and the district court did not err in waiting until after the voir dire to decide the change of venue motion.

 Larry Peters also challenges the trial court's subsequent denial of the venue motion. A motion for a change of venue under Fed.R.Crim.P. 21 [28] rests within the trial court's discretion.

> Due process, of course, requires that an accused be tried by an impartial jury free from outside influences.... Impartiality, however, does not mean complete juror ignorance of issues and events.... If a juror can put aside his impressions gained from pretrial publicity and render a fair verdict based upon the evidence, the impartiality requirement is satis-

fied.... Where juror exposure to pretrial publicity can be shown, defendants must still demonstrate that actual prejudice resulted.

*United States v. Garza,* 664 F.2d 135, 138 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982) (citations and footnote omitted). The record does not support a finding of actual prejudice from the publicity that would have necessitated a change of venue. Peters does not establish any actual prejudice. He relies upon statements by potential jurors at the voir dire who were later excused and upon unsubstantiated speculation. Peters' speculation, based upon an isolated comment by a sitting juror, is inconsistent with that juror's answers to other voir dire questions. Such speculation about the deliberations does not establish actual prejudice.

Nor was this one of the rare cases surrounded by such a "carnival atmosphere," *Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 1520, 16 L.Ed.2d 600 (1966), that prejudice can be presumed from the "pervasive and inflammatory" pretrial publicity. *United States v. Garza,* 664 F.2d 135, 138 n. 1 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982). *See United States v. Abrahams,* 453 F.Supp. 749 (D.Mass.1978). The trial judge's comments about the amount of publicity reflect only the judge's awareness of the situation and are not evidence of the jurors' inability or unwillingness to be impartial. While some of the answers of some of the prospective jurors might seem in the record or out of context to indicate prejudice from the publicity, we are satisfied that the district court's carefully conducted voir dire resulted in the selection of unprejudiced jurors. *See Garza,* 664 F.2d at 139 & n. 2; *United States v. Hueftle,* 687 F.2d 1305, 1310 (10th Cir.1982).

**28.** Rule 21(a) provides:

The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is

satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

The newspaper articles supporting the venue motion and cited as examples of the sensational press coverage are all dated from May through June of 1983. The voir dire of jurors did not begin, however, until April 1984, almost a year later. The trial judge was concerned about the amount of publicity and was in the best position to assess the effects of the publicity upon the potential jurors and upon the possibility of a fair trial. The trial judge was well aware of the possible influence of the publicity, and he took steps to ensure the jurors' impartiality and a fair trial. *See Sheppard v. Maxwell,* 384 U.S. 333, 358–63, 86 S.Ct. 1507, 1519–23, 16 L.Ed.2d 600 (1966) (trial court has a number of means at its disposal to "protect the jury from outside influence"). The judge excluded the press from the voir dire examination. The judge asked the potential jurors as a group if any of them had heard or read anything about the case. Those who indicated they had were individually and extensively questioned by the judge and each of the attorneys to determine the extent of that knowledge and to determine exactly what the potential juror had read or heard and what details the juror could recall.

Several potential jurors indicated having read approximately a dozen articles at various times, including a few articles which appeared in the weeks preceding the voir dire. Several jurors indicated that the articles they had read were not detailed. Most potential jurors, when asked to recite what information they had surrounding Anthony Peters' arrest, focused upon the seizure of property and drugs.

The judge impressed upon each potential juror the presumption of innocence and that the defendant need not present any evidence or any explanation. The judge then ascertained whether the prospective juror could be impartial and would make a decision in the case based only upon the evidence presented in the courtroom. Those who indicated they could not be impartial were excused. The judge on his own motion excused several more potential jurors whom he felt would be unable to approach the case with an open mind. The defendant does not point to any actual juror, as opposed to a prospective juror, who indicated an inability or unwillingness to follow the court's instructions to keep an open mind and to presume the defendants innocent until proven guilty beyond a reasonable doubt. When the actual jury had been chosen, the judge repeatedly instructed the jurors not to read or listen to any news reports of the case or talk to anyone about the case. We are not willing to speculate that the jurors disobeyed the judge's instructions.

Although asserting "irreparable" and pervasive prejudice from pretrial publicity, Larry Peters cites only two examples of comments by sitting jurors to support his contention. Although one of the jurors Peters cites did say that the initial news reports caused him to expect an explanation from Anthony Peters as to the source of his property, that same juror, upon further questioning, also said that "knowing what I do now after it's been explained through the judge, I think I could ... blindly [follow the instruction of the court that you have no right to expect a defendant to offer an explanation] without looking back at what I had heard previous." This same juror also stated that he could separate what he heard in the courtroom from his preconceived views and that he would "go with what I heard in the courtroom." He also understood and acknowledged that the defendant is presumed innocent. The juror stated that although he had initially formed an opinion from reading the newspaper, he did not have an opinion as to the defendant's guilt or innocence because of his presence at the voir dire proceedings. He indicated that from his "basic knowledge of what's going on now, ... I think it would be only fair that everything be heard before I do form an opinion."

The second juror indicated that in conversations with co-workers he had said that Anthony Peters was in "big trouble" if he was guilty or, alternatively, that Anthony Peters was in "big trouble." Peters also points out that this juror felt that "you can't print a lie in the paper, so some of it

must be true." This juror also indicated that he was envious of some of the defendants his own age being wealthy or having property. The juror further answered, however, that he would be able to put aside his "envy" and that it would not influence his decision on the defendants' guilt or innocence. He also indicated that although it probably would be hard to put aside his opinion, he thought he could render a decision based solely on the evidence presented in the courtroom. He also indicated that he would not expect Anthony Peters to explain his wealth because, based upon the judge's comments, he understood that he could not expect Peters to testify or to offer evidence.

These comments do not indicate that these jurors were not impartial. As the Supreme Court has stated,

> an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). Peters has not pointed out any actual prejudice from the publicity, and we find that the trial judge's voir dire examination adequately protected the defendant from any prejudice. *See United States v. Hendrix*, 752 F.2d 1226, 1231–32 (7th Cir.), *cert. denied sub nom. Merritt v. United States*, —— U.S. ——, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985). The district judge's conduct of the voir dire examination coupled with his repeated admonition to the selected jurors not to listen to or read any accounts of the trial or speak with anyone about the case satisfied due process requirements. We find no support for Peters' contention that the district court abused its discretion in denying the motion for change of venue.

## C. SEQUESTRATION

Larry Peters argues that the district court prejudiced the jury against Larry and Anthony Peters by abruptly sequestering the jury halfway through the four-week trial. Peters objects that both the timing and the manner in which the trial judge conducted the sequestration prevented Peters from receiving a fair trial.

 Peters argues that the trial court should have sequestered the jury from the beginning of the trial because the jury would have understood and accepted the burden of sequestration better, but we see no examples of publicity in the record that would have warranted immediate sequestration. Sequestration in a trial of this length is a drastic and extremely burdensome measure that is not required simply because the case attracts media attention. Sequestration and control of news coverage are appropriate to control "gross abuses of the news media in the guise of 'freedom of the press.'" *Margoles v. United States*, 407 F.2d 727, 733 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969).

The trial judge was fully aware of the publicity surrounding the trial, but he was also aware of the substantial hardship that sequestering a jury for an estimated four to six weeks of trial could impose. The court was understandably reluctant to impose sequestration upon the jury unnecessarily. When the court learned that a story based upon information not in the public record was about to be released, the trial judge ordered the sequestration.

Peters reasons that the jury would have accepted four weeks of sequestration better than two weeks because the jurors would not have been subjected to the court's "military-like commands" at the mid-trial sequestration. As we discuss in greater detail subsequently, we do not find that the trial judge's actions were "mili-

tary-like" nor did his actions prevent a fair trial. Had the trial judge not acted promptly as he did we expect the defendants would be here arguing that he did not protect the jury from the anticipated publicity.

Larry Peters also attacks the manner in which the trial judge effected the sequestration. The district court denied the defendants' pretrial motion for sequestration, which the defendants renewed at voir dire. Then, on Friday, May 4, 1984, the district court learned that on the following day an article was to be published in the Milwaukee Sentinel linking the case to drug deals allegedly involving several Milwaukee Brewers baseball players. The court ordered that each juror be read a written statement on Friday night stating that the jury was being sequestered, that the jury was to report to the court at 10:00 a.m. Saturday morning, and that the jury was still prohibited from listening to or reading press accounts.

 Peters complains that the judge's "military-like commands" and failure to explain the sequestration made the jury antagonistic to the defendants. The record does not support Peters' contention that the jurors blamed the defendants for the sequestration. The district court specifically instructed the jurors that he had ordered the sequestration, not the defendants or the government. We are unwilling to say that the jurors disregarded the trial judge's statement and arbitrarily decided to seek "revenge" on the defendants.

 We find that the district court handled the jury sequestration appropriately. The court responded to the exigencies of the moment upon learning of the imminent release of the newspaper article. There was no need for the trial court to explain the reason for the sequestration in its order on Friday night. The judge acted reasonably in seeking to sequester the jurors as quickly as possible in light of his knowledge of this particularly inflammatory article. In addition, the court's voir dire of the jury upon sequestration adequately protected the impartiality of the jury.

The court followed the procedure required in this circuit when prejudicial publicity is brought to the court's attention during the trial:

"[T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further."

*United States v. Balistrieri,* 779 F.2d 1191, 1214 (7th Cir.1985) (*quoting Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969)).

The trial judge individually questioned each juror the morning the jurors arrived to be sequestered. Only one juror indicated hearing the case mentioned in connection with the Milwaukee Brewers. The juror had immediately turned the car radio off, and she told the court that this brief exposure would not influence her or affect her impartiality. Larry Peters suggests that this juror's minimal exposure to this news report "necessarily adversely affected her view of the defendants." The record does not support this contention, and the court did not abuse its discretion in refusing to replace this juror with an alternate. It was unnecessary for the trial judge at the time of sequestration to question the jurors, as Peters suggests, about the impact of sequestration. At the voir dire examination before the trial began the judge had ascertained the possible impact of sequestration and of a lengthy trial.

The court's actions in sequestering the jury only when the need arose were reasonable and adequately protected the defendants' due process rights.

## D. ADMISSION OF TESTIMONY OF WITNESSES WITH AGREEMENTS WITH THE GOVERNMENT

Larry Peters next argues that the district court committed plain error in admit-

ting the testimony of certain witnesses who had performance agreements with the government. Larry Peters claims that the plea agreements between George Gama, John Redford, John Gingras, and Michael Taylor were contingent upon performance at trial and constituted a *per se* violation of due process because the nature of the agreements placed "a 'premium' on adverse testimony and motivated the witnesses to embellish upon or 'create' facts directly resulting in false testimony."

Neither Peters nor any other defendant objected on these grounds at trial. We therefore review the admission of this testimony under the "plain error" standard of Fed.R.Crim.P. 52(b).[29] "Plain error is an error so egregious that it resulted in 'an actual miscarriage of justice, which implies the conviction of one who but for the error probably would have been acquitted.'" *United States v. Sherwood,* 770 F.2d 650, 653 (7th Cir.1985) (*quoting United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)).

George Gama was promised an income tax evasion charge, instead of the original conspiracy charge, and a recommendation of a maximum sentence of three years. John Redford agreed to testify in return for substitution of a single charge with a maximum four-year sentence for the original multiple charges carrying a maximum fifteen-year penalty. The government also agreed not to make any "detrimental" sentencing recommendation and to inform the court of Redford's cooperation. In return for truthful testimony, the government agreed to drop the original conspiracy and distribution of cocaine charges against John Gingras, carrying a possible sixty-year penalty, for a lesser charge with a five-year sentence, and no sentence recommendation. Similarly, Michael Taylor understood that if he testified truthfully he would receive immunity, but that if he lied he would be prosecuted for perjury as well

as for his drug activity. At the time of trial Gama had not been sentenced, and Redford and Gingras were technically still defendants.

▉▉▉▉▉ The agreements are traditional plea agreements where the government exercises its prosecutorial discretion in exchange for truthful testimony from a government witness about the witness' associates. Conditioning performance of the agreement upon truthful testimony at trial does not encourage exaggeration or lying, but rather serves as a necessary means to ensure truthful compliance with the plea agreement. *See United States v. Kramer,* 711 F.2d 789, 795 (7th Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); *United States v. Kenney,* 598 F.Supp. 874, 879–80 (D.Me.1984). Although they may not have been fully performed, these agreements nevertheless were not contingent upon the outcome at trial or upon further prosecutions. *Cf. United States v. Baresh,* 595 F.Supp. 1132 (S.D.Tex.1984) (extremely lenient treatment of informant conditioned upon successful prosecution of "targeted" defendants); *United States v. Dailey,* 589 F.Supp. 561, 562 (D.Mass.1984), *vacated and remanded,* 759 F.2d 192 (1st Cir.1985) (plea agreement dependent upon the "success of the government's prosecutorial effort").

The details of each of the agreements in this case were fully revealed to the jury and were subject to cross-examination by each defendant's attorney. The jury, after being fully apprised of the various plea agreements, could adequately determine the reliability of this testimony. Each agreement was

> made and binding upon the government before ... [the witness] testified; it was not contingent upon the government's satisfaction with the content of the testimony. [Each government witness] ... could testify truthfully and fully pursuant to the agreement without fear of reprisal. [Each witness'] ... testimony

---

**29.** Rule 52(b) states:

(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed al-

though they were not brought to the attention of the court.

related to known facts; the agreement did not require the witness to seek out incriminating evidence against the appellant.... Further, the jury was fully apprised of the conditions under which [each witness] testified.

*United States v. Librach,* 536 F.2d 1228, 1230 (8th Cir.1976). These agreements did not put a "premium" upon adverse testimony nor create a risk of perjury so great that the admission of this testimony resulted in a miscarriage of justice. These agreements did not make the testimony unreliable as a matter of law and admission of this testimony "plain error."

Larry Peters relies upon the original panel's opinion in *United States v. Waterman,* 732 F.2d 1527 (8th Cir.), *vacated en banc by an equally divided court,* 732 F.2d at 1533 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985), holding that the district court in that case erred in denying the defendant's motion to vacate his sentence based upon an agreement between the government and the main prosecution witness. The witness, before testifying at Waterman's trial, had been sentenced to twelve years pursuant to a government agreement to testify against others in the scheme for participating in arson and fraud. The allegedly improper agreement was that the government would recommend a two-year reduction in the witness' sentence if the witness' continued cooperation led to further indictments. The original appellate panel found that "the government cannot consistent with due process offer favorable treatment to a prosecution witness contingent upon the success of the prosecution." *Id.* at 1532. The court also found that the jury could not "legitimate" that particular agreement by deciding upon the witness' credibility. The original panel therefore ordered the district court to release Waterman. An equally divided court sitting *en banc* reversed the appellate panel and affirmed the district court's refusal to vacate Waterman's sentence.

Peters' reliance upon *Waterman* is misplaced. The agreements at issue in this case differ substantially from the agreement in *Waterman.* In *Waterman* the prosecution's recommendation for the witness depended solely on whether the witness' testimony in front of the grand jury procured further indictments for the prosecution. The agreements in this case, however, were not linked to the outcome of the trial. The agreements in this case merely conditioned the sentencing recommendations upon truthful trial testimony.

The district court did not commit plain error by admitting the testimony of Gama, Redford, Gingras, and Taylor because the plea agreements negotiated with these witnesses do not offend due process.

### E. SEVERANCE MOTION

Larry Peters claims that the district court abused its discretion by refusing to sever Larry's trial from that of his brother Anthony Peters. Larry Peters asserts three bases for this claim: (1) the complexity of the case; (2) the disparity of the evidence; and (3) his fraternal relationship with codefendant Anthony Peters. We do not find any of these arguments to be meritorious.

 A motion to sever a trial is addressed to the trial court's sound discretion, and the court's decision will be reversed only upon a clear showing of abuse of that discretion. *United States v. Shue,* 766 F.2d 1122, 1135 (7th Cir.1985). On appeal the defendant must show actual prejudice from the denial. *United States v. Oglesby,* 764 F.2d 1273, 1276 (7th Cir. 1985). Establishing actual prejudice from a joint trial means showing that the defendant could not have a fair trial without severance, "not merely that a separate trial would offer him a better chance of acquittal." *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977). The general policy is that persons indicted together should be joined for trial, particularly where a conspiracy is charged which may be "proved against all defendants by the same evidence and which results from the same or similar series of acts." *United States v. Echeles,* 352 F.2d 892, 896 (7th Cir.1965).

*See also United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985). The strong public interest in having joint conspiracy trials, however, does not override the need to ensure the defendants a fair trial. *Kotteakos v. United States,* 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). In complex cases or cases with a disparity in the evidence, "the question of whether a joint trial infringes upon the defendant's rights to a fair trial depends on 'whether it is within the jury's capacity ... to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant.'" *United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981) (*quoting United States v. Kahn,* 381 F.2d 824, 839 (7th Cir.1967)). *See also United States v. Cavale,* 688 F.2d 1098, 1107 (7th Cir.), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 380, 75 L.Ed.2d 441 (1982). We are satisfied that in this case the jury was able to follow the court's limiting instructions and assessed Peters' guilt on the basis of the evidence against him.

Peters first argues that severance was warranted under Fed.R.Crim.P. 14 [30] because of the complex nature of the case. Four defendants were tried together on a fourteen-count indictment covering four years and numerous substantive acts. Larry Peters was charged in count one of conspiracy to distribute cocaine based upon a 1981 trip to Houston, Texas. The conspiracy charge encompassed twenty acts of various codefendants and other persons and acts referred to in the other thirteen counts of the indictment. Of the other thirteen counts, nine counts detail substantive acts of Anthony Peters only, two counts name Anthony Peters and another coconspirator, and one count was dismissed for lack of evidence.

In a related argument, Larry Peters claims that the disparity in evidence made it impossible for the jury to independently consider the evidence against him. Peters points to the relatively small amount of documentary evidence introduced against him and characterizes the testimonial evidence as showing that he was at most an "errand boy" for Anthony Peters, not part of a cocaine conspiracy. Larry Peters contrasts the evidence produced against him with the extensive evidence introduced against his brother Anthony Peters. This contrast, Peters asserts, inevitably led to a transference of guilt, with the evidence against Anthony Peters "rubbing off" on Larry Peters.

Peters' third argument is that the jury necessarily "lumped" the charges and evidence against Anthony Peters with those against Larry Peters because the two are brothers. Peters argues that his fraternal relationship with Anthony Peters made it impossible for the jury to follow the court's instructions and that his conviction thus resulted from "suspicion and innuendo" created by the evidence against Anthony Peters.

Peters has not, however, demonstrated any actual prejudice from the joint trial and "the fact that the evidence against his codefendant[] might have been proportionally greater than the evidence against him is not itself grounds for a severance." *United States v. Hendrix,* 752 F.2d 1226, 1232 (7th Cir.), *cert. denied sub nom. Merritt v. United States,* — U.S. —, 105 S.Ct. 2032, 85 L.Ed.2d 314 (1985). At the trial, six witnesses testified they regularly bought or received delivery of cocaine from Larry Peters during the time period of the conspiracy. Although Larry Peters dismisses this evidence as "highly suspect at best," credibility is an issue for the jury to determine. The testimony of these five witnesses provided ample evidence to support the jury's verdict against Larry Peters without the jury resorting to guilt by association.

Although the trial judge declined to instruct the jury each time evidence was

---

**30.** Rule 14 provides in relevant part:
 If it appears that a defendant ... is prejudiced by a joinder of ... defendants ... for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

admitted on count fourteen against Anthony Peters alone, the judge was willing to give an instruction during the trial in certain circumstances. For instance, defense counsel was particularly concerned about evidence relating to Anthony Peters' Chicago condominium decorating expenses, and, at defense counsel's request, the judge instructed the jury that these exhibits were received only as to Anthony Peters, not as to the other defendants. Furthermore, during the final jury instructions the trial judge reiterated several times in various contexts that the jurors must give "separate personal consideration to the case of each individual Defendant; ... leaving out of consideration entirely any evidence admitted solely against the other Defendant or Defendants." Finally, in addition to these general instructions, the court also made several statements directly applicable to Larry and Anthony Peters. The trial judge specifically instructed that "[a] conspiracy cannot be proven solely by a family relationship or other types of close association" and that "mere association with the alleged conspirators does not establish participation in the conspiracy."

The trial court's actions were sufficient to avoid any transference of guilt from the complexity of the case, the disparity of evidence, or the relationship between Larry and Anthony Peters. Although the trial judge declined to instruct the jury each time evidence was introduced only against Anthony Peters, he was willing to give such a clarifying instruction for items or exhibits which particularly concerned defense counsel. These occasional clarifying instructions during trial, coupled with the final jury instructions, were sufficient precaution against "spill-over" of evidence from Anthony Peters to Larry Peters. *See United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985); *United States v. Cavale,* 688 F.2d 1098, 1108 (7th Cir.), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed.2d 534 (1982). Moreover, the acquittal of Thomas Pogodzinski on the conspiracy charge indicates the jury's understanding of and compliance with the trial court's limiting instructions. *See United*

*States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Shue,* 766 F.2d 1122, 1135 (7th Cir.1985).

We believe that the jury was able to follow the court's instructions and to properly "separate, collate and appraise the evidence relevant only to each defendant." *United States v. Kahn,* 381 F.2d 824, 839 (7th Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 592, 19 L.Ed.2d 661 (1967). Accordingly, we find that the district court did not abuse its discretion in denying the severance motion.

## F. SENTENCING

Larry Peters' final argument is that the district court abused its discretion in sentencing him to twelve years in prison. Peters points to the disparity between his sentence and those of his codefendants and objects to the trial judge's refusal to sentence him under the Young Adult Offender Statute.

■ Peters argues that his sentence of twelve years evidences a gross abuse of discretion in light of codefendant Sal Dacquisto's sentence of eighteen months for his participation in the conspiracy and codefendant Anthony Peters' sentence of twenty-two years for operating a continuing criminal enterprise. Larry Peters asserts that in comparison his sentence was unduly harsh and inconsistent with his participation in and the severity of the respective crimes.

The trial court has broad discretion in sentencing, and " 'a mere showing of disparity of sentences among codefendants does not constitute an abuse of discretion.' " *United States v. Herrera,* 757 F.2d 144, 150 (7th Cir.1985) (*quoting United States v. Cardi,* 519 F.2d 309, 315–16 (7th Cir.1975)). Moreover, "[a] sentence which is within the limits established by the statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercis-

ing his discretion or failed to exercise any discretion at all in imposing the sentence." *United States v. Harris*, 761 F.2d 394, 402–03 (7th Cir.1985). *Accord United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). Peters' sentence was within the statutory limit,[31] and our review of his sentence is therefore extremely limited.

The trial court's comments in sentencing Peters indicate that the court based its decision upon Larry Peters' role as second-in-command of the conspiracy, upon the magnitude of the offense, and upon the need to deter others. The trial judge's remarks also indicate that he considered the need to protect society and the possibility of rehabilitation. All of these factors are proper considerations in determining an appropriate sentence. *See United States v. Hedman*, 630 F.2d 1184, 1201 (7th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Although concluding that he would not be afraid to have Larry Peters "circulating in society" and that Peters was a good prospect for rehabilitation, the district court stressed the offense committed and the strong need for deterrence in imposing a twelve-year sentence.

Peters characterizes his role in the conspiracy as that of an "errand boy." The judge, however, described Larry Peters as the "executive officer, ... the lieutenant, the one who carried out the things that had to be done, that Tony [Peters] didn't see fit to take care of himself." Larry Peters' argument that his sentence is inconsistent with the sentences of Anthony Peters and Sal Dacquisto is further undermined by the judge's remark that he took "a structured

view of the dispositions that are made of all of the convicted defendants, taking into cognizance the roles in making the ... [conspiracy] succeed."

Focusing upon one of the trial court's comments at sentencing,[32] Larry Peters claims that the district court based its sentence upon a mistaken notion that Larry Peters shared in Anthony Peters' accumulation of wealth. Commenting upon the sentencing decision, this court has noted that "[t]he task is not a simple one for the conscientious judge, indeed is an awesome responsibility, and it is easy with hindsight to seize out of context upon words, perhaps prompted by judicial soul-searching, to claim that the sentencing was somehow improperly influenced." *United States v. Cardi*, 519 F.2d 309, 313 (7th Cir.1975).

As discussed above, the record reveals that the court considered a number of factors, but focused primarily upon Larry Peters' integral role in this serious crime and upon the need for deterrence. In discussing the seriousness of the crime, the trial judge made the remarks to which Larry Peters objects. In the context of the trial judge's other remarks at sentencing, however, we do not believe that the trial judge based his sentencing decision upon an erroneous understanding of the facts. The trial court's remarks during the sentencing hearing reflect a thoughtful balancing of appropriate factors, and the record does not indicate any abuse of discretion in imposing a twelve-year sentence on Larry Peters.

█ Larry Peters also challenges the district court's refusal to apply the Young Adult Offender Statute (the "Act"), 18 U.S.C. § 4216.[33] Peters describes himself

---

**31.** Larry Peters was convicted of conspiring to distribute cocaine, a violation of 21 U.S.C. § 846, carrying a maximum penalty of fifteen years.

**32.** The trial judge remarked:
I realize that there is probably a good deal of magnification in some of the testimony ... but cold hard facts are that there was *an awful lot of property being accumulated by a bunch of punk kids who just were praying on*

*other people's greed and desire to have something that they shouldn't have,* that Congress has dictated for the good of the young people that they will not be permitted to have you and Tony and the rest of you do what you were doing in supplying that need.
Peters objects to the emphasized portion of the judge's comment.

**33.** 18 U.S.C. § 4216 provides:

as "a prime candidate" for treatment under the Act and argues that the court failed to consider the fact that Larry Peters was "a follower and not a leader" in the conspiracy. Addressing a similar situation the Supreme Court stated that "[o]nce it is made clear that the sentencing judge has considered the option of treatment under the Act and rejected it, ... no appellate review is warranted." *Dorszynski v. United States,* 418 U.S. 424, 443, 94 S.Ct. 3042, 3053, 41 L.Ed.2d 855 (1974). *See also United States v. Ford,* 627 F.2d 807, 813 (7th Cir.), *cert. denied,* 449 U.S. 923, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980); *United States v. Negron,* 548 F.2d 1085, 1087 (2d Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2981, 53 L.Ed.2d 1096 (1977).

The trial court made a specific finding of fact that as Larry Peters was twenty-four years old when convicted he was eligible for treatment under the Act. The court furthermore stated that he had considered using the Act, but decided on balance that the case was not appropriate for the Act because of the magnitude of the crime. In this case, it is clear that the court considered applying the Act and declined to do so. We will not disturb the court's decision.

### III. JACEK ODONER

Jacek Odoner was convicted of one count of conspiring to distribute cocaine in violation of 21 U.S.C. § 846, and was sentenced to eight years in prison. Odoner appeals his conviction and cites nine alleged errors: (1) the district court's refusal to hold an evidentiary hearing on the pretrial publicity; (2) the court's denial of a motion for change of venue; (3) the court's refusal to initially sequester the jurors; (4) the court's denial of a severance motion; (5) the admission of testimony of government witnesses with performance agreements; (6) the admission of coconspirator hearsay; (7) the court's refusal to grant a mistrial; (8) the sufficiency of the evidence; and (9) the imposition of an eight-year sentence.

### A. REFUSAL TO HOLD AN EVIDENTIARY HEARING

Odoner claims the trial judge erred in refusing to hold an evidentiary hearing to allow the defendants to convince the court of the "massive and inflammatory bias" created by pretrial publicity. As discussed above in reference to Larry Peters, see section II(A) *supra,* we find this argument unpersuasive. The district court did not abuse its discretion by waiting until the voir dire to determine the effect of pretrial publicity.

### B. DENIAL OF MOTION FOR CHANGE OF VENUE

Odoner next argues that the publicity in this case was inherently prejudicial and that the trial judge thus abused his discretion in refusing to transfer the trial under Fed.R.Crim.P. 21(a). We disagree, as our previous discussion in section II(B) indicates.

### C. SEQUESTRATION

Odoner objects that the court's mid-trial sequestration order unduly prejudiced the defendants by causing the jurors to speculate about the cause of the abrupt sequestration. As discussed in regard to Larry Peters, we find this argument unpersuasive. *See* section II(C) *supra.*

### D. SEVERANCE MOTION

Odoner presents two of the same arguments raised by Larry Peters to establish that the trial court should have severed

In the case of a defendant who has attained his twenty-second birthday but has not attained his twenty-sixth birthday at the time of conviction, if after taking into consideration the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be con-

sidered pertinent, the court finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act (18 U.S.C., chap. 402) sentence may be imposed pursuant to the provisions of such Act.

Anthony Peters' trial from that of the other defendants. Odoner claims severance was warranted by the complexity and length of the case and by the great disparity of evidence between Anthony Peters and Odoner. As discussed in section II(E) above, we find that the jury followed the trial court's instructions and considered the evidence against each defendant separately.

The government introduced sufficient evidence to establish Odoner's involvement in the conspiracy based upon his own actions. Several witnesses testified that Odoner delivered cocaine for Anthony Peters to them for several years. Two witnesses testified that Odoner stored cocaine for the conspiracy pending distribution and sale. In addition, one witness testified that Larry Peters indicated Odoner had made several trips to Florida to buy cocaine for Anthony Peters. This evidence, coupled with the trial court's admonitory instructions, ensured that Odoner's conviction was based on his own actions and not upon transference of guilt.

■ Odoner also charges that severance was warranted by an unusual admission by Anthony Peters' counsel. In closing argument Peters' counsel stated that Anthony Peters was involved in a conspiracy to districute cocaine and was guilty as charged in count one of the indictment, but was not guilty of operating a continuing criminal enterprise. Odoner claims that the jury could never "compartmentalize" the evidence following such an admission. The admission by Peters' counsel referred only to Anthony Peters' involvement in a cocaine conspiracy. Peters' counsel did not go on to list other members of the conspiracy. Although such admissions by counsel for codefendants may cause problems, the statement here at most merely supported the government's contention that a conspiracy existed. This admission, however, did not resolve the issue of whether Odoner participated in the conspiracy. The jury's acquittal of codefendant Pogodzinski on the conspiracy count indicates that, despite Anthony Peters' counsel's unusual statement during final argument, the jury could and indeed did segregate the evidence relating to each defendant.

Consequently, for the reasons stated above, the trial court did not abuse its discretion in denying Odoner's severance motion.

## E. WITNESSES WITH AGREEMENTS WITH THE GOVERNMENT

Odoner reiterates Larry Peters' challenge to the admission of the testimony of witnesses who negotiated deals with the government. We have already fully discussed and rejected the argument that the agreements were contingent and therefore violated due process. *See* section II(D) *supra.*

■ Odoner also challenges the testimony of five witnesses who received immunity for their testimony. One of these witnesses, Mark Gernetzke, testified that the government threatened him with prosecution and obtained statements from him before he received immunity. Defense counsel did not object to the testimony at the time it was offered, and therefore reversal is warranted only if the admission of this testimony was plain error. Plain error must be conspicuous and such that reversal of the conviction is necessary to avoid a miscarriage of justice. *United States v. Silverstein,* 732 F.2d 1338, 1348 (7th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). These immunity agreements did not make the risk of perjury so great that the testimony was *per se* unreliable. *See United States v. Cruz,* 739 F.2d 395, 396 (8th Cir.1984). The immunity agreement was one factor the jury could weigh in determining the witness' credibility, but the agreement alone did not " 'make ... [the] testimony so legally unsubstantial or ... [the person's] credibility as a witness so legally infirm as to require reasonable doubt to be recognized as a matter of law.' " *United States v. Evans,* 697 F.2d 240, 245 (8th Cir.), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983) (*quoting Williams v. United States,* 328 F.2d 256, 259 (8th Cir.),

*cert. denied*, 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964)). Each witness disclosed the details of the immunity agreement under which he testified. The testimony "related to known facts; the agreement did not require the witness to seek out incriminating evidence against the appellant." *United States v. Librach*, 536 F.2d 1228, 1230 (8th Cir.), *cert. denied*, 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976). This testimony was properly admitted as the jury was capable of evaluating the testimony in light of the witness' agreement with the government.

Furthermore, the court gave complete final instructions cautioning the jury about the testimony of witnesses with agreements with the government. The trial judge instructed the jury to "consider the testimony of such witnesses with more caution than the testimony of other witnesses." The judge also indicated that the witnesses may have had reason to lie or exaggerate "because they wanted to strike a good bargain with the government about their own cases." The court thus specifically addressed at length the concerns Odoner now raises for the first time on appeal. We find no error in the admission of the testimony of these witnesses with immunity agreements.

## F. INSTRUCTION ON AND ADMISSION OF HEARSAY TESTIMONY

Jacek Odoner challenges both the court's instruction at the time of the admission of hearsay statements of codefendant Pogodzinski and the court's admission of hearsay testimony from John Gingras.

---

**34.** For the text of Rule 801(d)(2), see note 14 *supra*.

**35.** Odoner properly states that a trial judge decides the admissibility of such coconspirator hearsay statements by determining " 'if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy.' " *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978) (*quoting United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977)). The

As discussed earlier in section I(E) *supra*, the better course would have been for the trial court to refrain from commenting to the jury about the procedure for admitting coconspirator hearsay. *See United States v. Santiago*, 582 F.2d 1128, 1136 (7th Cir.1978); *United States v. Vinson*, 606 F.2d 149, 153 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). We nevertheless conclude that the court's statements did not prejudice any of the defendants or improperly influence the jury's decision. The court's comments did not amount to a clear and unambiguous signal to the jury that the judge was satisfied that a conspiracy existed. Furthermore, the jury had ample evidence, *see* section III(H) *infra*, to determine, based upon Odoner's acts, that Odoner was a member of the cocaine conspiracy. Odoner, therefore, was not deprived of an impartial jury, and reversal is not warranted on that ground.

Odoner also challenges the trial court's admission of hearsay testimony by John Gingras under the coconspirator's statement exception of Fed.R.Evid. 801(d)(2).[34] Gingras testified that Anthony Peters told him that he (Peters) had sent Edward Odoner, defendant Jacek Odoner's brother, "out west" with $778,000 and that Ed Odoner never returned.

Odoner argues that Gingras' testimony about Ed Odoner should have been excluded to avoid confusing the jury and creating "an aura of guilt by association." Odoner thus does not challenge the district court's *Santiago* determination,[35] but rather

---

*Santiago* formulation of this determination indicates this court's adoption of the "preponderance" standard, a higher standard than the former "prima facie" test. Odoner, moreover, correctly points out that membership in a conspiracy must be based only on a defendant's own acts and admissions. *Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). Apparently, however, Odoner does not object to the trial court's applications of these principles to the issue of the admissibility of Gingras' testimony about Ed Odoner.

mounts an evidentiary attack based on Fed. R.Evid. 403.[36]

It is fundamental that the balancing of prejudice and probativeness under Rule 403 is committed to the trial court's sound discretion and will not be disturbed on appeal absent abuse. *United States v. Falco,* 727 F.2d 659, 665 (7th Cir.1984). A trial judge has broad discretion in making this determination, *United States v. Vincent,* 681 F.2d 462, 465 (6th Cir.1982), and his decision must be "accorded great deference." *Falco,* 727 F.2d at 665.

Odoner has not made a clear showing of abuse of discretion by his conclusory statements that the testimony about Edward Odoner confused the jury and necessarily resulted in "guilt by association." Odoner does not explain or present any foundation for these conclusions, and we find no support for them in the record. The government presented sufficient evidence to establish Odoner's participation in the conspiracy based upon Odoner's own acts. *see* section III(H) *infra.* The jury had no reason to resort to "guilt by association" to convict Odoner. As stated earlier in response to Lawrence Peters' severance motion, *see* section II(E) *supra,* we believe the jury was capable of separating the evidence and determined each defendant's guilt or innocence based only upon evidence implicating that defendant. Nothing in the record suggests that the jury convicted Odoner based upon isolated hearsay concerning his brother. We conclude that the trial court did not abuse its discretion in admitting the hearsay testimony of John Gingras.

## G. REFUSAL TO GRANT A MISTRIAL

Odoner claims that the district court erred in refusing to grant a mistrial based on the erroneous admission of testimony of witnesses with government agreements and of hearsay testimony under the coconspirator's exception. As discussed in section II(D) and III(E), the trial court did not abuse its discretion in admitting this testimony, and therefore the court did not abuse its discretion in refusing to grant a mistrial. *United States v. Phillips,* 640 F.2d 87, 91 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981).

## H. SUFFICIENCY OF THE EVIDENCE

Odoner challenges the sufficiency of the evidence supporting his conviction on one count of conspiring to distribute cocaine. Odoner claims that the government never introduced proof of any direct contact between Odoner and either Anthony or Larry Peters.

It is well-established that

"[t]he appellant mounting an evidentiary sufficiency challenge bears 'a heavy burden.' *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977), and thus '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' *Brandom v. United States,* 431 F.2d 1391, 1400 (7th Cir. 1970), *cert. denied,* 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971). Moreover, it is not for this court to reconsider questions of the weight of the evidence or credibility of witnesses, *Glasser,* 315 U.S. [60] at 80, 62 S.Ct. [457] at 469 [86 L.Ed. 680 (1942)]."

*United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985) (*quoting United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983)).

Odoner correctly states that mere association with conspirators is not sufficient to establish involvement in a conspiracy. Instead, the government must prove that Odoner knew of the conspiracy to distribute cocaine and that Odoner in some way joined the conspiracy. *See United*

---

**36.** Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

States v. Percival, 756 F.2d 600, 610–11 (7th Cir.1985); United States v. Herrera, 757 F.2d 144, 149 (7th Cir.1985). Reviewing the evidence in the light most favorable to the government, Percival, 756 F.2d at 610, there was sufficient evidence to support the jury verdict.

██ The testimony of five of the government's witnesses establishes that Odoner played several different roles in the conspiracy. Two witnesses, Mark Gernetzke and Randy Hill, testified that for several years Odoner delivered cocaine ordered from Anthony Peters to them. George Gama told the jury that he went to Odoner's home with Anthony Peters to pick up cocaine he had bought from Peters. Anthony Peters told him at the time that cocaine was stored at Odoner's home. Michael Schroeder's testimony corroborates this, as Schroeder testified he also picked up cocaine at Odoner's home with Larry Peters. Schroeder furthermore testified that he rejected Larry Peters' offer to go to Florida and that Larry told him that Odoner travelled to Florida several times to pick up cocaine for $10,000 a trip. The government introduced hotel and airline records indicating that Odoner travelled from Milwaukee to Miami. In addition, Michael Dale stated that he delivered cocaine with Anthony Peters to Odoner.

This testimony belies Odoner's claim that there was no proof of any contact between Odoner and the Peters brothers and that the evidence failed to prove Odoner's guilt. If the jury found these witnesses credible, their testimony establishes that Odoner not only acted as a "delivery boy" for the conspiracy but also stored the cocaine in his home and went to Florida to buy the cocaine for subsequent distribution in Milwaukee. The evidence was sufficient to establish that Odoner knew of the conspiracy and voluntarily participated in it.

## I. SENTENCING

Odoner's final objection is to the trial court's imposition of an eight-year sentence. Odoner argues that as the evidence established that he was only a "delivery boy," eight years was a harsh sentence to impose upon a first offender and was inconsistent with his involvement in the conspiracy. Odoner also claims that evidence regarding the disappearance of his brother Edward Odoner, allegedly with $778,000 given to him by Anthony Peters, improperly influenced the court's sentencing decision. Neither of these arguments is persuasive.

██ As discussed with regard to codefendant Larry Peters, see section II(F) supra, a reviewing court will not change or vacate a sentence within statutory limits absent evidence that the trial court relied on improper or unreliable evidence. See United States v. Noble, 754 F.2d 1324, 1332 (7th Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985).

██ We do not find any abuse of discretion in the sentence imposed. Although this is Odoner's first offense, the evidence showed that Odoner was substantially involved for several years in this conspiracy to distribute massive amounts of cocaine. Odoner was instrumental in transporting the cocaine from Florida, storing it pending distribution, and also distributing it in Milwaukee. Considering the magnitude of the offense and the amount of Odoner's participation, the trial court did not abuse its discretion in sentencing Odoner to eight out of the sixteen years possible under 21 U.S.C. § 846.

██ Finally, a review of the sentencing hearing transcript refutes Odoner's argument that the trial court based its sentencing decision upon improper factors. Odoner does not point to any remark by the trial judge that would substantiate his argument. The argument is based on mere speculation and is meritless. The trial judge's comments when handing down the sentence indicate that he relied upon proper bases for his decision. Before imposing the sentence, the trial judge questioned Odoner about his brother's role in the conspiracy and whether his brother had $778,000 with him when he disappeared. The trial court considered the type of offense,

Odoner's role in storing the cocaine and acting "as a courier and a carrier," and the need to deter others. The trial judge also realized the need to "keep a balance between these sentences as between the role that the various people played in the operations of the enterprise." All of these are appropriate considerations, and nothing indicates that the trial judge relied on improper or unreliable evidence. The trial court did not abuse its discretion by imposing an eight-year sentence on Odoner.

## IV. CONCLUSION

The defendants raised numerous issues in this appeal. We are satisfied that Judge Warren exercised his discretion appropriately during this lengthy and complex case. Accordingly the convictions and sentences of all three defendants are

AFFIRMED.